IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| U.S. APRONS, Inc., A Nebraska Corporation, | ) ) ) | |
| Plaintiff, | ) ) | 7:08CV5003 |
| v. | ) ) ) | **MEMORANDUM** |
| R-FIVE, Inc., | ) ) | **AND ORDER** |
| Defendant. | ) ) ) | |

This is a contract action brought by textile manufacturer U.S. Aprons, Inc., ("U.S. Aprons") against fabric supplier R-Five, Inc., ("R-Five") seeking $100,637.73 in damages for R-Five's alleged breach of (1) contract; (2) express warranty; (3) implied warranty of fitness for a particular purpose; and (4) implied warranty of merchantability.[1]

Pending before the court is a summary judgment motion[2] filed by defendant R-Five. (Filing 88.)

---

[1] This is a diversity action pursuant to 28 U.S.C. § 1332. "'Federal district courts sitting in diversity . . . must apply the forum state's substantive law.'" *PHL Variable Ins. Co. v. Fulbright McNeill, Inc.*, 519 F.3d 825, 828 (8th Cir. 2008) (quoting *Guardian Fiberglass, Inc. v. Whit Davis Lumber Co.*, 509 F.3d 512, 515 (8th Cir. 2007)). Since both parties agree that the Uniform Commercial Code ("U.C.C.") and Nebraska law apply to this dispute, I shall cite and apply the U.C.C. as enacted in Nebraska. (See Filing 134, Order on Final Pretrial Conf. at 3 (parties agree that Nebraska law applies to this case).)

[2] Due to additional briefing regarding choice of law requested by the defendant, this summary judgment motion was not ripe for resolution until January 13, 2010.

## I. UNDISPUTED MATERIAL FACTS

For purposes of the pending motion for summary judgment, the parties agree that the following facts are undisputed:

1. U.S. Aprons is a Nebraska corporation with its principal place of business in Sidney, Nebraska. Founded approximately 22 years ago, the company makes finished textile products including aprons, smock tops, tunics, vests, head wear, bow ties, salon apparel, oven mitts, and potholders. To make these products, U.S. Aprons purchases fabric from various fabric mills. U.S. Aprons sells its products to various customers. (Filing 7, Amended Complaint at 1; Filing 90-5, Dep. David Mowery 13:9-12, 21:13-18, 22:21-24:20; Filing 90-4, Dep. Dwayne Ahlberg 18:8-19:5.)

2. R-Five is an Illinois corporation with its principal place of business in Chicago, Illinois. The company is a fabric mill that supplied fabric to U.S. Aprons. (Filing 7, Amended Complaint at 1-2; Filing 90-5, Dep. David Mowery 24:10-25:21.)

3. Southern Glove is a manufacturer with operations in Honduras that contracts with, among others, U.S. Aprons to assemble the textile products U.S. Aprons sells. Southern Glove is a contractor of U.S. Aprons, but there is otherwise no corporate relationship between U.S. Aprons and Southern Glove. (Filing 90-5, Dep. David Mowery 20:18-21:12.)

4. Hanover Uniforms ("Hanover") is a supplier of uniforms, vests, and similar products. (Filing 90-8, Dep. John Mintz 16:8-17:6.) King America Finishing is a fabric dying and finishing plant that dyed the fabric at issue in this case, with its principal place of business in Dover, Georgia. (Filing 126-1, Dep. Warren Levins 23:23-24:3, 56:3-5; Filing 90-4, Dep. Dwayne Ahlberg 36:12-19.) The parties agree that R-Five did not dye the fabric in question in this case. (Filing 134, Order on Final

Pretrial Conf. at 2.)

5. Hanover entered into a contract with the American Red Cross ("ARC") to supply disaster-relief vests to ARC. Hanover ordered the vests from U.S. Aprons. (Filing 90-8, Dep. John Mintz 26:6-19, 35:9-36:6.) U.S. Aprons ordered some of the red and white fabric needed to construct the vests from the defendant. U.S. Aprons subcontracted the construction of the vests to Southern Glove, and Southern Glove constructed the vests in Honduras. (Filing 134, Order on Final Pretrial Conf. at 2.)

6. U.S. Aprons officials, in conjunction with Hanover officials, developed the specifications for the vests, which included what types of fabric to use in their construction, and which were approved by ARC. (Filing 90-8, Dep. John Mintz 49:7-51:16, 57:4-61:8.) R-Five was neither involved in, nor consulted about, the development of these specifications. (Filing 134, Order on Final Pretrial Conf. at 2.)

7. The parties agree that the series of fabric transactions at issue in this case formed a contract between U.S. Aprons and R-Five, the terms of which consist of the printed terms on the invoices and purchase orders, and as provided by the Uniform Commercial Code. (Filing 134, Order on Final Pretrial Conf. at 2.) Specifically, on or about March 17, 2006, U.S. Aprons issued—by way of fax from Nebraska—Purchase Order No. 5220 to R-Five in which U.S. Aprons offered to purchase approximately 5,000 yards of red fabric. On or about April 24, 2006, R-Five sent from Illinois to Nebraska Invoice No. 123974, which accepted U.S. Aprons' offer by selling to it 4,743 yards of red fabric. U.S. Aprons received the fabric it ordered from R-Five by way of shipment to Southern Glove in North Carolina. (Filing 90-1, Ex. 11 of Dep. Dwayne Ahlberg; Filing 90-4, Dep. Dwayne Ahlberg 39:6-44:20.)

8. The terms of Purchase Order No. 5220 and Invoice No. 123974 called for the purchase and supply of "SUPER TWILL 65" #51090 FIERY RED CRF & PS

3

100% COTTON" fabric to be shipped to "US APRONS C/O SOUTHERN GLOVE 749 AC LITTLE DR. NEWTON, NC 28658." The phrase "ALL CLAIMS TO BE MADE WITHIN 30 DAYS OR BEFORE MATERIAL IS CUT" appeared on Invoice No. 123974. (Filing 90-1, Ex. 11 of Dep. Dwayne Ahlberg.)

9. On or about May 1, 2006, U.S. Aprons issued—by way of fax from Nebraska—Purchase Order No. 5227 to R-Five in which U.S. Aprons offered to purchase approximately 15,000 yards of red fabric. On or about May 26, 2006, and June 15, 2006, R-Five sent from Illinois to Nebraska Invoice No. 124396 accepting U.S. Aprons' offer by selling to it a total of 14,049 yards of red fabric. U.S. Aprons received the fabric it ordered from R-Five by way of shipment to Southern Glove in Honduras, F.O.B. Dover, Georgia. (Filing 90-2, Ex. 12 of Dep. Dwayne Ahlberg; Filing 90-4, Dep. Dwayne Ahlberg 44:21-46:18.)

10. The terms of Purchase Order No. 5227 and Invoice No. 124396 called for the purchase and supply of "SUPER TWILL 65" #51090 FIERY RED CRF & PS 100% COTTON" fabric to be shipped to "GUANTES SURENOS, S.A. ZIP CONTINENTAL LA LIMA, CORTES HONDURAS." The phrase "ALL CLAIMS TO BE MADE WITHIN 30 DAYS OR BEFORE MATERIAL IS CUT" appeared on Invoice No. 124396. (Filing 90-2, Ex. 12 of Dep. Dwayne Ahlberg.)

11. On or about May 1, 2006, U.S. Aprons issued—by way of fax from Nebraska—Purchase Order No. 5228 to R-Five in which U.S. Aprons offered to purchase approximately 5,000 yards of white fabric, and on or about May 26, 2006, R-Five sent from Illinois to Nebraska Invoice No. 124395 accepting U.S. Aprons' offer by selling to it 5,051 yards of white fabric. U.S. Aprons received the fabric it ordered from R-Five by way of shipment to Southern Glove in Honduras, F.O.B. Dover, Georgia. (Filing 90-3, Ex. 13 of Dep. Dwayne Ahlberg; Filing 90-4, Dep. Dwayne Ahlberg, 46:19-48:4.)

12. The terms of Purchase Order No. 5228 and Invoice No. 124395 called for the purchase and supply of "7 OZ P[olyester]/C[otton] TWILL 65/66" #01066 OPTICAL WHITE HAND & FRAME  65% POLY/35% COTTON" fabric to be shipped to "GUANTES SURENOS, S.A. ZIP CONTINENTAL LA LIMA, CORTES HONDURAS."  The phrase "ALL CLAIMS TO BE MADE WITHIN 30 DAYS OR BEFORE MATERIAL IS CUT" appeared on Invoice No. 124395. (Filing 90-3, Ex. 13 of Dep. Dwayne Ahlberg.)

13. All of the purchase orders and invoices called for shipment of the fabric to U.S. Aprons via Southern Glove at its North Carolina location, or F.O.B. to a carrier in Dover, Georgia, for ultimate shipment to Southern Glove's Honduras location. (Filings 90-1, 90-2, 90-3, Exs. 11-13 of Dep. Dwayne Ahlberg.) The parties agree that the fabric R-Five delivered to U.S. Aprons conformed with the description provided on the face of the above-described purchase orders and invoices that made up the contract between the parties. (Filing 134, Order on Final Pretrial Conf. at 2.)

14. Part of the damages claimed by U.S. Aprons in this case is for fabric supplied by R-Five that U.S. Aprons alleges was defective, and that was already cut for purposes of manufacturing by U.S. Aprons' contractor Southern Glove, either as pieces awaiting assembly or as assembled vests, prior to U.S. Aprons' presentation of a claim to R-Five for allegedly defective fabric. (Filing 90-4, Dep. Dwayne Ahlberg 81:18-84:19, 104:2-105:7; Filing 90-9, Ex. 1 of Dep. David Mowery; Filing 90-5, Dep. David Mowery 42:12-18, 46:6-23, 57:22-58:6.)

15. The value of allegedly defective fabric that was not already cut is $13,790.88, representing 4,392 yards of red fabric still on rolls purchased from R-Five at a per-yard purchase price of $3.14. (Filing 90-9, Ex. 1 of Dep. David Mowery; Filing 90-10, Ex. 23 of Dep. Dwayne Ahlberg; Filing 90-4, Dep. Dwayne Ahlberg 86:6-14, 94:11-20.)

16. R-Five replaced the fabric it originally shipped to U.S. Aprons with a new shipment of fabric that was satisfactory to U.S. Aprons. (Filing 90-4, Dep. Dwayne Ahlberg 69:12-71:5; Filing 134, Order on Final Pretrial Conf. at 3.)

17. In addition, R-Five gave U.S. Aprons a credit for $29,411.34. (Filing 90-11, Ex. 25 of Dep. Dwayne Ahlberg; Filing 65, Report of Robert Rauner, Exs. A, A-8, A-9, A-10; Filing 134, Order on Final Pretrial Conf. at 3.)

## II. ISSUES

Defendant R-Five argues that, whether or not there are genuine issues of material fact in this case, U.S. Aprons is barred from bringing its claims due to contractual obligations regarding the condition of the fabric and contractual limitations on recoverable damages.[3] Specifically, R-Five maintains that:

(1) ***Cut Fabric:*** As to the fabric supplied by R-Five that has been cut, the language appearing on R-Five's invoices to U.S. Aprons that stated "ALL CLAIMS TO BE MADE WITHIN 30 DAYS OR BEFORE MATERIAL IS CUT" bars any claims by U.S. Aprons regarding this cut fabric.

(2) ***Uncut Fabric:*** As to the fabric supplied by R-Five that remains

---

[3]While not apparent from the parties' briefs, counsel stated during a telephone conference call with the court that there are two material facts in dispute: (1) whether the defendant supplied the allegedly defective fabric, and (2) even if the defendant did supply the fabric, whether the cause of the discoloration was the result of something the defendant did, or was responsible for, or the result of something extrinsic to the defendant. The defendant argues that these disputed material facts do not foreclose summary judgment in its favor because legal defenses apply that bar the plaintiff's claims altogether.

uncut, which the parties agree is valued at $13,790.99, the terms of the parties' contract are supplemented by the "usage of trade" in the textile industry, known as the Worth Street Textile Market Rules. These Rules state that the seller, R-Five, warrants only that its merchandise will conform with the description on the face of the contract; that performance and other physical or chemical characteristics of the merchandise are not guaranteed; and that the seller makes no warranty in fact or law that the merchandise is suitable for any particular purpose or use. Because R-Five delivered to U.S. Aprons merchandise conforming to the specific description in the parties' contract and made no further warranties, U.S. Aprons' claims regarding express warranty, implied warranty of fitness for a particular purpose, and implied warranty of merchantability must fail.

(3) ***Limitation on Damages:*** (A) The Worth Street Textile Market Rules provide that if the seller replaces any merchandise not in accordance with the contract, the buyer may not make any claims against the seller. Because R-Five replaced the defective fabric, U.S. Aprons cannot make a claim against R-Five regarding such fabric. (B) The Worth Street Textile Market Rules, which R-Five argues have been incorporated into the parties' contract, limit liability for breach to the difference between the contract price and the fair market price on the contract date of delivery. The Rules specifically prohibit the buyer from claiming consequential damages or "profit of any description," as has been requested by U.S. Aprons in its amended complaint. (Filing 7, Amended Complaint at 5 (requesting the "costs of the vests, unusable fabric, lost profits, and the cost of determining and remedying the product defects").)

7

Essentially, R-Five claims that (1) the language appearing on its invoices to U.S. Aprons that stated "ALL CLAIMS TO BE MADE WITHIN 30 DAYS OR BEFORE MATERIAL IS CUT" bars any claims by U.S. Aprons as to the fabric that has already been cut; (2) the "usage of trade" in the textile industry (the Worth Street Textile Market Rules) bars U.S. Aprons' claims altogether; and (3) the Worth Street Textile Market Rules also prevent U.S. Aprons from recovering consequential damages. I will address each of these arguments separately.

## A. "ALL CLAIMS TO BE MADE WITHIN 30 DAYS OR BEFORE MATERIAL IS CUT"

The parties agree that the terms of the contract between them "consist of the printed terms on the invoices and purchase orders, and as provided by the Uniform Commercial Code." (Filing 134, Order on Final Pretrial Conf. at 2.) Thus, the parties agree that the remedy-limiting phrase "ALL CLAIMS TO BE MADE WITHIN 30 DAYS OR BEFORE MATERIAL IS CUT"—which was included on all three of R-Five's invoices to U.S. Aprons—was part of the parties' contract.

Section 2-719(2) of Nebraska's Uniform Commercial Code provides, "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in the Uniform Commercial Code."

> Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.
>
> However, it is of the very essence of a sales contract that *at least minimum adequate remedies be available*. If the parties intend to conclude a contract for sale within this Article[,] they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. . . . [W]here an apparently fair and reasonable clause *because of circumstances* fails

>   in its purpose or operates to deprive either party of the substantial value
>   of the bargain, it must give way to the general remedy provisions of this
>   Article.

U.C.C. § 2-719 (Official Comment 1) (emphasis added).

While the contract provision requiring the fabric buyer to assert claims "within 30 days or before material is cut" may be fair and reasonable in other cases, the dye or fabric defect in *this* case was not discoverable until *after* the white and red fabric had been cut and sewn together, as the yellowing did not occur until the two fabrics were joined. Under these circumstances, application of the you-cut-it-you-own-it provision would completely deprive U.S. Aprons of any remedy for breach. Thus, this language must yield to the "general remedy provisions" of the U.C.C., which allow a buyer a reasonable amount of time to notify the seller of the breach after he discovers, or should have discovered, the product defect. U.C.C. § 2-607(3)(a) ("Where a tender has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.").[4]  *See* 14 *Williston on Contracts* § 40:40 (4th ed. 2009) ("where the circumstances cause an exclusive or limited remedy to fail of its essential purpose—where circumstances occur following the parties' agreement to limit remedies that makes what appeared to be a fair and reasonable limited or exclusive remedy unfair or unreasonable—the limitation may be ignored and the buyer may obtain the remedies otherwise available under the Uniform Commercial Code").

Under the circumstances of this case, I conclude that the language appearing on R-Five's invoices to U.S. Aprons that stated "ALL CLAIMS TO BE MADE . . . BEFORE MATERIAL IS CUT" must yield to the general remedy provisions of the

---

[4] Plaintiff has submitted evidence indicating that once U.S. Aprons discovered the cause of the fabric discoloration, it informed R-Five via e-mail within six days. (Filing 107-1, Aff. Dwayne Ahlberg ¶ 7 & Ex. D.)

9

U.C.C., which would have allowed U.S. Aprons a reasonable time to notify R-Five after its discovery that the fabric, or dying thereof, was defective—which was necessarily *after* the fabric was cut. Therefore, R-Five's motion for summary judgment is denied insofar as it argues that the "ALL CLAIMS TO BE MADE WITHIN 30 DAYS OR BEFORE MATERIAL IS CUT" language bars U.S. Aprons' claims as to the cut fabric.[5]

## B. The Worth Street Textile Market Rules Regarding Warranties

R-Five next argues that it is entitled to summary judgment on all of the plaintiff's claims because the parties' contract incorporates a "usage of trade" in the textile industry known as the "Worth Street Textile Market Rules." According to the defendant, the Rules state that the seller warrants only that its merchandise will conform with the description on the face of the contract; that performance and other physical or chemical characteristics of the merchandise are not guaranteed; and that the seller makes no warranty in fact or law that the merchandise is suitable for any particular purpose.

"A . . . usage of trade in the . . . trade in which [the parties] are engaged or of

---

[5]U.S. Aprons argues that the "you-cut-it-you-own-it" provision is unconscionable or *became* unconscionable after time due to the subsequent occurrence of fabric yellowing that was not previously contemplated or experienced by the parties. (Filing 106, Pl's Br. Opp'n Def.'s Mot. Summ. J. at 14-15, 18.) However, unconscionability must be apparent "at the time of contracting. That it appear unconscionable at the time of performance is irrelevant. The test is not by hindsight." 1 James J. Wright & Robert S. Summers, *Uniform Commercial Code* § 4-3 (5th ed. 2009). *See also Myers v. Nebraska Inv. Council*, 724 N.W.2d 776, 799 (Neb. 2006) ("A contract is not substantively unconscionable unless the terms are grossly unfair under the circumstances that existed *when the parties entered into the contract*.") (emphasis added). In this case, there is no evidence that the disputed language was unconscionable at the time of contracting.

10

which they are or should be aware is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." U.C.C. § 1-303(d); *see also* 1 James J. Wright & Robert S. Summers, *Uniform Commercial Code* § 3-3 (5th ed. 2009) ("The agreement of the parties includes that part of their bargain that may be found in course of dealing, usage of trade, or course of performance. These sources are relevant not only to the interpretation of express contract terms, but may themselves constitute contract terms.") (footnotes omitted). Further, "an implied warranty can also be excluded or modified by . . . usage of trade." U.C.C. § 2-316(3)(c).

A "usage of trade" under the Nebraska U.C.C. is:

> any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage must be proved as facts. If it is established that such a usage is embodied in a trade code or similar record, the interpretation of the record is a question of law.

U.C.C. § 1-303(c) (emphasis added).

It is unnecessary for the contracting parties to be "consciously aware" of the trade usage; it is sufficient "if the trade usage is such as to 'justify an expectation' of its observance." 1 James J. Wright & Robert S. Summers, *Uniform Commercial Code* § 3-3 (5th ed. 2009).

> Generally, absent an express statement or implication to the contrary, the rule is that when parties undertake to conclude a contract, the formation of which is governed by a general usage, the implication is that they intend to proceed according to the usage in question. In such cases, unless the contrary appears, it is considered that the parties proceeded

11

on the tacit assumption of the usages, but reduced into writing only the particulars of the agreement, omitting to specify those known usages which are routinely included by mutual understanding.

12 Williston on Contracts § 34:3 (4th ed. 2009) (footnotes omitted). *See also Nebraska Builders Products Co. v. Industrial Erectors, Inc.*, 478 N.W.2d 257, 265 (Neb. 1992) ("A contract may be found in the bargain of the parties by their language or by implication from other circumstances, such as course of dealings or usage of trade."); *Miller v. Great Western Comm'n Co.*, 152 N.W. 787, 788 (Neb. 1915) (pre-U.C.C. case stating that a "'principal who deals in a market must be presumed to deal according to the custom of that market, thus making that custom a part of his contract'") (quoting 2 Jones, Law of Evidence (1st ed.) § 465).

The question raised by R-Five's motion for summary judgment is whether the Worth Street Textile Market Rules constitute a "practice or method of dealing having such regularity of observance" in the textile industry that those Rules supply various terms of the contract between U.S. Aprons and R-Five regarding warranties, guarantees, and limitations on damages.

The Worth Street Textile Market Rules themselves proclaim that they are "recognized as the standard code of procedure and trade customs applicable to the purchase, sale and use of textile and allied lines." (Filing 90-6, Ex. A at CM/ECF p. 7.) Interestingly, the "Standard Textile Salesnote" portion of the Rules—which contains the provisions that R-Five says bars U.S. Aprons' claims[6]—states that it is "effective with respect to any contract [after July 1, 1986], which *incorporates the*

---

[6]That is, that the seller warrants only that its merchandise will conform with the description on the face of the contract; that performance and other physical or chemical characteristics of the merchandise are not guaranteed; that the seller makes no warranty in fact or law that the merchandise is suitable for any particular purpose; and that if the seller replaces any merchandise that is allegedly inconsistent with that described in the contract, the buyer may not make any claims against the seller.

12

*Standard Textile Salesnote by reference*, expressly giving notice that it provides for arbitration of disputes." (Emphasis added.) Here, it is undisputed that there is no reference whatsoever to the Worth Street Textile Market Rules in the parties' purchase orders and invoices that form the parties' contract.[7] (Filings 90-1, 90-2, 90-3.)

It is also undisputed that U.S. Aprons has never heard of the Rules.[8] (Filing 90-4, Dep. Dwayne Ahlberg 30:16-20; Filing 90-5, Dep. David Mowery 25:22-26:5.) Further, the president of Hanover Uniform Company, to whom U.S. Aprons was to supply the completed vests, is not familiar with the Worth Street Textile Market Rules or any "standard trade rules" or "general rules of dealing" in the textile industry. (Filing 90-8, Dep. John Mintz 22:11-21.)

The only other evidence in the record dealing with the Worth Street Textile Market Rules is an affidavit by the executive vice-president of King America Textile Group, an entity owned by the defendant, who has "been a part of the textile industry for 49 years and [is] familiar with the industry's general usage of trade, customs, and

---

[7]It is also interesting to note that the Worth Street Textile Market Rules that R-Five says form part of the parties' contract as a "usage of trade" provide that the parties consent to jurisdiction of the Supreme Court of the State of New York or the United States District Court for the Southern District of New York "for all purposes relating to this contract." The Rules also state that the "laws of the State of New York shall apply to this contract and shall control its interpretation." Yet the parties in this case have stipulated in the Order on Final Pretrial Conference that "Nebraska law applies to this case." (Filing 90-6, Ex. A at CM/ECF pp. 8, 10; Filing 134, at 3.) Apparently, R-Five wants to pick and choose which parts of the Worth Street Textile Market Rules should be incorporated into the parties' agreement.

[8]While it is not necessary for the contracting parties to be consciously aware of the usage of trade at the time of contract formation, unawareness of the supposed "industry standard" rebuts R-Five's assertion that the Worth Street Textile Market Rules are "regularly observed" in the industry.

standards for doing business in the industry" and who states that the Worth Street Rules "are a set of rules that reflect the industry standard for the textile industry." (Filing 90-6, Aff. Warren Levins ¶¶ 4, 6, 7 & Ex. A.) Levins states that he is "familiar with the existence of the National Textile Association and its Internet web site" and that the web site "lists the Worth Street Rules at the top of a list of publications that are 'textile industry standards and practices'." (*Id*. ¶ 7 & Ex. B.)

On the evidence before me, I must conclude that R-Five has proven neither the "existence" nor "scope" of the purported usage of trade that would justify an expectation that the Worth Street Textile Market Rules would be observed in the formation of the parties' contract. U.C.C. § 1-303(c). R-Five has shown that the Rules physically exist. However, a statement by one employee of an entity owned by the defendant that these Rules are the "industry standard" and the existence of a trade association's web site that lists the Rules as a textile industry "standard and practice" are insufficient to establish that the Worth Street Textile Market Rules, or parts of them, are "regularly" observed in textile industry contracts such that they should be considered a "usage of trade" that added significant terms to the parties' contract under Nebraska's U.C.C.[9]

---

[9]R-Five relies on *Suzy Phillips Originals, Inc. v. Coville, Inc.*, 939 F. Supp. 1012 (E.D.N.Y. 1996), for the proposition that the Worth Street Textile Market Rules are a standard trade practice in the textile industry. In that case, the court referred to the Worth Street Rules to support its conclusion that limitation-of-damages clauses were standard in contracts between garment manufacturers and textile converters. *Id*. at 1018-19. However, the court specifically noted that "Plaintiff has not argued, nor presented any evidence, that the Worth Street Rules do not constitute standard industry practice." *Id*. at 1019. Here, there is evidence that both Plaintiff, a textile manufacturer, and the president of Hanover Uniforms, a uniform supplier that is not a party to this case, have never heard of the Rules, suggesting that the Rules might not actually represent an industry-wide standard.

This is especially so when representatives of two of the textile companies involved in the contractual chain—U.S. Aprons and Hanover Uniforms—stated they were unaware of the Worth Street Textile Market Rules, suggesting that the Rules are not really a "standard" practice in the textile industry. *See* 12 *Williston on Contracts* § 34:19 (4th ed. 2009) ("the evidence of the existence of a custom or usage can be insufficient to warrant submission of the question to the jury and in any event the question of the existence of a custom or usage should not be submitted to the jury unless substantial evidence showing all requisites of a valid custom or usage has been presented") (footnotes omitted); 1 James J. Wright & Robert S. Summers, *Uniform Commercial Code* § 3-3 (5th ed. 2009) ("Proof of course of dealing or course of performance seldom requires resort to expert witnesses and poses no special problem under the hearsay rule in the law of evidence. This is not so of usage of trade. To prove it, a party must usually call on an expert."); *Swift & Co. v. Elias Farms, Inc.*, 539 F.3d 849, 854 (8th Cir. 2008) (addressing party's argument in Minnesota breach-of-contract case that usage of trade established parties' intent regarding interpretation of contract term, court noted that party did not cite "undisputed evidence regarding the general industry practice" or the specific usage of the disputed term in industry contracts; "Perhaps such evidence could be developed, but on this record, we do not believe Swift has shown conclusively that when the parties to this particular contract used the [disputed term], they necessarily meant to implement the sort of ledger contract" that was "prominent in dealings between hog producers and packers in the 1990s"). *See, e.g., Laird v. Scribner Coop, Inc.*, 466 N.W.2d 798, 804 (Neb. 1991) (to establish standard of merchantability in the trade, plaintiff could not rely only on testimony of lay witness; when product defect is obvious to laymen, reliance on eyewitness testimony is not fatal, but when performance standards of product are not generally known, expert testimony is usually necessary to prove acceptable standards of performance); *Emco Mills, Inc. v. Isbrandtsen Co.*, 210 F.2d 319, 323 (8th Cir. 1954) (in Arkansas contract case, court found that because there was "a real conflict in the evidence as to whether the rules of the Grain and Feed Dealers National Association reflected the custom and practice of the business of both plaintiff and

defendant, those rules may not be made the controlling criterion of the duty defendant owed plaintiff").

Accordingly, the defendant's motion for summary judgment, insofar as it asserts that the Worth Street Textile Market Rules supply terms in the parties' contract regarding warranties—including that the seller warrants only that its merchandise will conform with the description on the face of the contract; that performance and other physical or chemical characteristics of the merchandise are not guaranteed; and that the seller makes no warranty in fact or law that the merchandise is suitable for any particular purpose—is denied.

### C.  Worth Street Textile Market Rules & Limitations on Recoverable Damages

Finally, R-Five maintains that the Worth Street Textile Market Rules, as incorporated into the parties' contract, provide that if the seller replaces any merchandise not in accordance with the contract, the buyer may not make any claims against the seller. Because R-Five replaced the defective fabric, the defendant argues, U.S. Aprons cannot make a claim for damages against R-Five regarding such fabric. Further, R-Five contends that the Worth Street Textile Market Rules specifically limit liability for breach to the difference between the contract price and the fair market price on the contract date of delivery, and the Rules specifically prohibit the buyer from claiming consequential damages or "profit of any description," as has been requested by U.S. Aprons in its amended complaint.

For the reasons discussed in detail above, there is insufficient evidence before me upon which to conclude that these damage-related provisions of the Worth Street Textile Market Rules were incorporated into the parties' contract as a "usage of trade" within the meaning of the Nebraska U.C.C. Therefore, this aspect of R-Five's motion for summary judgment shall be denied as well.

Accordingly,

IT IS ORDERED that the defendant's motion for summary judgment (filing 88) is denied.

DATED this 10th day of February, 2010.

> BY THE COURT:
> *Richard G. Kopf*
> United States District Judge

---

\*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.